UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

RONALD  C.  HOOD,  JR.  aka
Erika Denise Hood

      Plaintiff,

v.                              Case No: 2:12-cv-637-FtM-29DNF

DEPARTMENT OF CHILDREN AND
FAMILIES, DAVID E. WILKINS,
Secretary of DCF, and
DANIEL MONTALDI, SVPP
Administrator,

      Defendants.

_____/

## OPINION AND ORDER

Plaintiff Ronald C. Hood ("Plaintiff") initiated this action by filing a complaint pursuant to 42 U.S.C. § 1983 (Doc. 1).[1]  This matter is presently before the Court upon review of a motion for summary judgment filed by Defendants David E. Wilkins, Secretary of Florida's Department of Children and Families ("DCF"), and Daniel Montaldi, Administrator of the Sexual Violence Prevention

---

[1] Plaintiff filed this complaint as "Ronald C. Hood, Jr.", but periodically refers to himself as "Erika Denise Hood" and periodically uses feminine pronouns when referring to himself in the complaint.  The Defendants refer to Plaintiff solely with male pronouns.  In the numerous exhibits attached to the complaint, Plaintiff is referred to as a male.  In order to remain consistent with the majority of pleadings and documents before this Court and to avoid confusion, this Order will use masculine pronouns when referring to Plaintiff.

Program ("SVPP") at DCF (collectively, "Defendants") (Doc. 48, filed June 22, 2014).  Plaintiff has filed a response to the motion for summary judgment (Doc. 50), and it is now ripe for review.

For the reasons set forth in this Order, Defendants' motion is **GRANTED IN PART** and **DENIED IN PART**.

## I.  Pleadings

### A.  Complaint

Plaintiff is a resident at the Florida Civil Commitment Center ("FCCC") in Arcadia, Florida (Doc. 1).[2]  The allegations of, and attachments to, Plaintiff's complaint state the following:

---

[2] The Florida legislature enacted the Sexually Violent Predators Act, Florida Statute §§ 394.910-394.913, by which a person determined to be a sexually violent predator is required to be housed in a secure facility "for control, care, and treatment until such time as the person's mental abnormality or personality disorder has so changed that it is safe for the person to be at large." Fla. Stat. § 394.917(2).  The Act was promulgated for the dual purposes "of providing mental health treatment to sexually violent predators and protecting the public from these individuals." Westerheide v. State, 831 So. 2d 93, 112 (Fla. 2002); Kansas v. Hendricks, 521 U.S. 346 (1997)(holding that the Kansas Sexually Violent Predator Act did not establish criminal proceedings, and involuntary confinement pursuant to the Act was not punitive).  Civil commitment under the Act involves several steps.  First, the Act requires a mental evaluation of any person who has committed a sexually violent offense and is scheduled for release from prison or involuntary confinement.  See generally Fla. Stat. § 394.913.  The evaluation is conducted by a multi-disciplinary team of mental health professionals who must determine whether the individual meets the definition of a "sexually violent predator."  After the evaluation, the state attorney may file a petition with the circuit court alleging that the individual is a sexually violent predator subject to civil commitment under the Act.  Id.  If the judge determines the existence of probable cause that the individual is a sexually

Plaintiff has been an intermittent resident at the FCCC since October 1, 2000 (Doc. 1 at 1).  Since January of 2001, he has filed numerous grievances seeking treatment for gender identity disorder ("GID").[3]  Although DCF knew of Plaintiff's diagnosis of

---

violent predator, then he or she will order the individual to remain in custody. Id. at § 394.915.  Thereafter, a jury trial, or a bench trial if neither party requests a jury trial, will commence. Id.  If the jury finds the individual to be a sexually violent predator by clear and convincing evidence, then the individual will be committed to the custody of the Department of Children and Family Services for "control, care, and treatment until such time as the person's mental abnormality or personality disorder has so changed that it is safe for the person to be at large." Id. at § 394.917.

[3] In Kothmann v. Rosario, the Eleventh Circuit defined GID:

> The diagnostic criteria for GID include "[a] strong and persistent cross-gender identification . . ., [a] [p]ersistent discomfort with [one's] sex or sense of inappropriateness in the gender role of that sex ..., [and the absence of] a physical intersex condition ... [which] cause[ ] clinically significant distress or impairment in social, occupational, or other important areas of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 537–38 (4th ed. 1994).

558 F. App'x 907, 908, n.2 (11th Cir. Mar. 7, 2014) (alterations in original). The Eleventh Circuit explained that the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders replaces the term "gender identity disorder" with the more descriptive term of "gender dysphoria."  This Court notes that older cases dealing with the same diagnosis refer to GID as "transsexualism." Because the parties both refer to Plaintiff's

GID prior to October of 2000, it has ignored his "serious medical need" and has "refused to provide <u>any</u> form of therapy for the Plaintiff's Serious Medical Condition of Gender Identity Disorder (GID)." <u>Id.</u> at 3 (emphasis in original).

Plaintiff wrote to Defendant Secretary David Wilkins and inquired as to whether DCF had a policy for treatment of transgender residents (Doc. 1 at 1-2). In response, Plaintiff received a letter from Defendant Montaldi who informed Plaintiff that DCF does not have a policy for transgender treatment and services (Ex. A at 26). Plaintiff has sought outside assistance for GID (Doc. 1 at 4).

Plaintiff attached numerous documents as exhibits to his complaint (Ex. A; Ex. B; Ex. C). Plaintiff submitted grievances to the FCCC in which he requested that he be placed on hormone therapy in contemplation of sex reassignment surgery (Ex. A at 1-21). In response to these requests, the FCCC referred Plaintiff to medical professionals to discuss his concerns. <u>Id.</u> at 1-2, 12, 13, 20, 21. However, treatment was delayed, in part due to a pending charge against Plaintiff for possession of child pornography.[4] The FCCC declined to begin any treatment until the

_____

diagnosis as one of "gender identity disorder" or "GID," for the sake of clarity and consistency, this Court will do the same.

[4] On June 22, 2009, while a resident at the FCCC, Plaintiff was charged with possession of child pornography and sentenced to

charges were resolved. Id. at 3, 4, 7, 8.  Plaintiff also attached psychiatric medical reports in which his medical providers discuss his mental health issues, including his alleged gender identity concerns (Doc. 1 at Ex. B).

Plaintiff wrote a letter to the Department of Children and Families in which he requested hormone therapy; asked to be addressed by his female name; and asked the FCCC to hire a therapist who specialized in transgender issues to aid him in making the transition to a female (Ex. A at 22).  He also requested that the FCCC provide him with the appropriate hormones, female clothing, and feminine products from an English company that specialized in transgender products. Id. at 22-23.  In response, Plaintiff was advised that the hormone treatment and therapy he requested was not part of the comprehensive treatment plan at the FCCC. Id. at 24.  Plaintiff was also advised that he had not been diagnosed with GID, and therefore, his request for hormonal therapy was not considered appropriate. Id.  Plaintiff was told that addressing him by his female name would be "clinically unwise" and that "any authentic female clothing found in any resident possession would be considered as contraband." Id.

---

three years and ten months in the Florida Department of Corrections.  After serving his sentence, Plaintiff returned to the FCCC on or about August 21, 2013 (Doc. 48-1 at 3).

As relief for Defendants' failure to formulate a policy for the treatment of FCCC residents diagnosed with GID, Plaintiff sought a declaration that his constitutional rights have been violated; an order that Defendants formulate a policy for the treatment of gender nonconforming people in conjunction with the World Professional Association for Transgender Health's Standard of Care; an order that Plaintiff receive hormone therapy, female clothing, feminine cosmetics, feminine hygiene items, and any reasonable transgender accessories he requests; a declaration that Plaintiff would have been eligible for release from the FCCC had he received immediate treatment for GID; damages for wages he would have received had he been released from FCCC at an earlier date; an order that Plaintiff be allowed to receive, possess, use, and wear female clothing, feminine cosmetics, feminine hygiene items, and other transgender accessories; and any other relief this Court deemed just and proper (Doc. 1 at 4).

**B.   Motion to Dismiss**

Defendants filed a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (Doc. 24, filed July 3, 2013). Defendants asserted that Plaintiff had not sufficiently alleged a serious medical condition; that formulating a policy for treatment was a discretionary governmental function; that Plaintiff was attempting to attribute liability to Defendants under an impermissible *respondeat superior* theory; that Defendants

- 6 -

were entitled to Eleventh Amendment immunity; and that dismissal of Plaintiff's due process and First Amendment claims was appropriate because he had not explained how Defendants violated his due process or First Amendment rights (Doc. 24 at 3-11).

This Court partially granted Defendants' motion to dismiss (Doc. 33). Specifically, the Court concluded that Plaintiff's claims for damages were barred by Eleventh Amendment Immunity (Doc. 33 at 9-10). The Court further concluded that Plaintiff's claims for declaratory and injunctive relief were barred by Eleventh Amendment Immunity against the Department of Children and Families, but were not barred against Defendants Wilkins and Montaldi in their official capacities to the extent Plaintiff sought prospective injunctive and declaratory relief. Id. at 11-12. Further, the Court, citing Turner v. Safley, 482 U.S. 78, 89 (1987) and Pesci v. Budz, 730 F.3d 1291 (11th Cir. 2013), recognized that a regulation is not unconstitutional if it is "reasonably related" to legitimate penological interests:

> When Plaintiff requested that the FCCC "purchase and allow [him] to wear all of the female clothing and feminine products" he wanted (Ex. A at 23), Plaintiff was informed that it was clinically unwise for him to be addressed by a female name and that, because all the residents at the FCCC were male, female clothing was prohibited (Ex. A at 24). Plaintiff was provided a rational, non-arbitrary basis for regulating resident attire and restricting Plaintiff to the use of his legal name. Moreover, accommodation of Plaintiff's right to wear female clothing and

cosmetics would be unduly burdensome for FCCC officials.

Even assuming that Plaintiff has been diagnosed with GID, an assumption that is not supported by the exhibits attached to Plaintiff's complaint, the Court has no found authority indicating that a transgender person has the right to choose the clothing worn while confined or that the facility is constitutionally obligated to purchase all the clothing and feminine products requested. In fact, generally, federal courts have held the opposite. See e.g. Murray v. United States Bureau of Prisons, 106 F.3d 401 (6th Cir. 1997) (transsexual prisoner not entitled to wear clothing of his choice and prison officials do not violate the Constitution simply because the clothing is not aesthetically pleasing); Star v. Gramley, 815 F. Supp. 276 (C.D. Ill. 1993) (noting that provision of female clothing to transsexual prisoner would be unduly burdensome for prison officials and would make little fiscal sense); Jones v. Warden of Stateville Corr. Center, 918 F. Supp. 1142 (N.D. Ill. 1995) ("Neither the Equal Protection Clause nor the First Amendment arguably accord [Plaintiff] the right of access to women's clothing while confined in a state prison.").

(Doc. 33 at 22-23). Under this reasoning, the Court dismissed Plaintiff's claim that the FCCC is required purchase, and allow Plaintiff to wear feminine clothing and other products. Id.

**C.   Motion for Summary Judgment**

On June 27, 2014, Defendants filed the instant motion for summary judgment in which they generally assert that they did not violate Plaintiff's First, Eighth, or Fourteenth Amendment Rights; that the staff at the FCCC disagreed with Plaintiff's self-

diagnosis of GID; that GID is not a serious medical condition as it relates to Plaintiff; and that Defendants' actions did not increase the length of Plaintiff's stay at the FCCC (Doc. 48 at 9). Defendants provide only two documents in support of their motion. Defendants attach an unsworn April 18, 2013 letter from FCCC psychologist Shawn Duffee to county judge Jessica Recksiedler in which Plaintiff's mental health progress to that date is detailed (Doc. 48-1). Defendants also attach the FCCC's policy regarding resident clothing and personal care items (Doc. 48-2).

In response, Plaintiff argued that the male-only policy for clothing is not related to a legitimate security interest;[5] the staff at the FCCC was not qualified to diagnose gender identity disorder; the defendants violated his Fourteenth and Eighth Amendment rights; and that the state gains financially from Plaintiff's continued confinement at the FCCC (Doc. 50).

## II. **Legal Standards**

### A. **Summary Judgment**

Summary judgment is appropriate only if it is shown "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

---

[5] It is unclear why either litigant addressed Plaintiff's request that the FCCC purchase and allow Plaintiff to wear feminine clothing. This claim was considered and dismissed on February 26, 2014 (Doc. 33). It will not be further addressed by this Court.

The Supreme Court has explained the summary judgment standard as follows:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).   The movant may meet this burden by presenting evidence that would be admissible at trial indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.   Id. at 322-324.

If the party seeking summary judgment meets the initial burden of demonstrating the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to come forward with sufficient evidence to rebut this showing with affidavits or other relevant and admissible evidence. Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991).   Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial." <u>Celotex</u>, 477 U.S. at 322, (1986).

The standard for creating a genuine dispute of fact requires courts to make all *reasonable* inferences in favor of the party opposing summary judgment, but it does not require the courts to make all *possible* inferences in the non-moving party's favor. <u>Chapman v. Al Transp.</u>, 229 F.3d 1012, 1013 (11th Cir. 2000). Moreover, a factual dispute alone is not sufficient to defeat a properly pleaded motion for summary judgment.  Instead, "[o]nly factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment." <u>Lofton v. Sec'y Dep't of Children & Family Servs.</u>, 358 F.3d 804, 809 (11th Cir. 2004) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986)).

Finally, in the summary judgment context, the Court must construe *pro se* pleadings more liberally than those of a party represented by an attorney. <u>Loren v. Sasser</u>, 309 F.3d 1296 (11th Cir. 2002).

**B.   Declaratory and Injunctive Relief**

To obtain relief under 42 U.S.C. § 1983, a plaintiff must prove: (1) that a right secured by the Constitution or laws of the United States was violated; and (2) that the violation was committed by a person acting under color of state law. <u>West v. Atkins</u>, 487 U.S. 42, 48 (1988).  In order to obtain permanent

injunctive relief under § 1983, the plaintiff must show: (1) that he has prevailed in establishing the violation of the right asserted in his complaint; (2) there is no adequate remedy at law for the violation of this right; (3) irreparable harm will result if the court does not order injunctive relief; and (4) if issued, the injunction would not be adverse to the public interest. KH Outdoor, LLC v. City of Trussville, 458 F.3d 1261, 1268 (11th Cir. 2006); Alabama v. U.S. Army Corps of Eng'rs, 424 F.3d 1117, 1128 (11th Cir. 2005). The scope of the awarded relief must not exceed the identified harm. Califano v. Yamasaki, 442 U.S. 682, 702 (1979) ("[T]he scope of injunctive relief is dictated by the extent of the violation established[.]").

### C.   Deliberate Indifference

Prison officials violate the Eighth Amendment when they act with deliberate indifference to a plaintiff's health or safety. Estelle v. Gamble, 429 U.S. 97, 97 (1976). To state an Eighth Amendment claim for deliberate indifference to a serious medical need, a plaintiff must allege: (1) a serious medical need; (2) deliberate indifference to that need by the defendants; and (3) causation between the defendants' indifference and the plaintiff's injury. Youmans v. Gagnon, 626 F.3d 557, 563 (11th Cir. 2010). In order to establish deliberate indifference to a serious medical need on the part of a defendant, a plaintiff must show subjective knowledge of a risk of serious harm and disregard of that risk by

conduct that is more than gross negligence. <u>Townsend v. Jefferson County</u>, 601 F.3d 1152, 1158 (11th Cir. 2010).

The Court recognizes that the FCCC is not a prison and Plaintiff is not a prisoner. <u>Troville v. Venz</u>, 303 F.3d 1256, 1260 (11th Cir. 2002).  Under the Due Process Clause of the Fourteenth Amendment, involuntarily committed persons retain substantive liberty interests, which include at least the right to adequate food, shelter, clothing and medical care; safe conditions of confinement; and freedom from unnecessary bodily restraint. <u>Youngberg v. Romeo</u>, 457 U.S. 307, 315-316 (1982). To determine whether the nature and extent of an infringement of one of these liberty interests rises to the level of a due process violation, a court must balance the individual's liberty interest against the relevant state interests. <u>Id.</u> at 320-321.  In general, "if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" <u>Bell v. Wolfish</u>, 441 U.S. 520, 539 (1979).

As the rights of the involuntarily civilly committed are "at least as extensive as the rights of the criminally institutionalized," actions which would violate the Eighth Amendment rights of a prisoner, would likewise constitute a violation of the due process rights of an individual who was been involuntarily civilly committed. <u>See</u> <u>Dolihite v. Maughon By and</u>

- 13 -

<u>Through Videon</u>, 74 F.3d 1027, 1041 (11th Cir. 1996).  Indeed, the Eleventh Circuit has recognized that "relevant case law in the Eighth Amendment context also serves to set forth the contours of the due process rights of the civilly committed." <u>Id.</u>  Therefore, while recognizing that Plaintiff is not a prisoner, this Court will examine relevant Eighth Amendment case law in its consideration of this case.

III. <u>Analysis</u>

    **A.**    **Defendants are entitled to partial summary judgment on Plaintiff's claims that the FCCC failed to offer treatment for GID and refused to provide hormone therapy**

Plaintiff does not allege a constitutional violation based on Wilkins' or Montaldi's personal refusals to treat his GID. Rather, Plaintiff attributes liability to Wilkins and Montaldi based upon the fact that DCF does not have a formal policy for the treatment of transgender FCCC residents.  Defendants argue that they are entitled to summary judgment on this claim because, with or without a policy for treatment, Plaintiff does not suffer from a serious medical need (Doc. 48 at 8).

    **1.**    **Serious Medical Need**

Defendants assert that "the evidence submitted by the plaintiff does not definitely show that the plaintiff has GID." (Doc. 48 at 8).  Defendants argue that to the extent some record evidence indicates that Plaintiff was diagnosed with GID prior to

his civil commitment, "there are references that show that staff at FCCC disagreed with said diagnosis" and that the "difference of opinion did not lead the defendants to believe the plaintiff suffered from GID." Id.  Defendants further argue that, even if Plaintiff suffers from GID, it is not "a serious medical condition as it relates to the plaintiff." Id.

Defendants have presented no affidavits, depositions, or other sworn testimony from FCCC staff stating that Plaintiff does not suffer from GID.  Rather, in support of their motion for summary judgment, the defendants submitted an April 18, 2013 letter from Dr. Shawn B. Duffee, a psychologist at the FCCC, which states in part:

> The resident was evaluated initially in July and August 2000 by the Department of Children and Families' multidisciplinary team under section 394.913, Florida Statues. Salvatore M. Blandino, Ph.D. reported Mr. Hood met DSM-IV diagnostic criteria for Pedophilia, Sexually Attracted to Both, Exclusive Type, **Gender Identity Disorder in Adults**, Sexually Attracted to Both (Provisional), and Bipolar Disorder, Unspecified (Rule out).  Dr. Blandino concluded the resident met criteria as a sexually violent predator.
>
> Dr. J. Partyka, Ph.D. reported that Mr. Hood met DSM-IV diagnostic criteria for Pedophilia, Sexually Attracted to Both, **Gender Identity Disorder in Adults**, Sexually Attracted to Both, Polysubstance Dependence in Sustained Remission in a Controlled Environment, Dissociative Disorder NOS (Rule out), Antisocial Personality Disorder with Psychopathic, Schizotypal, and Narcissistic Traits.  Dr. Partyka concurred with Dr.

> Blando's opinion that Mr. Hood met commitment
> criteria as a sexually violent predator.

(Doc. 48-1 at 1-2) (emphasis added).  As noted by Defendants, despite the initial diagnoses of Drs. Blandino and Partyka, there is evidence in the record showing that some FCCC health care professionals did not believe that Plaintiff suffered from GID. See Ex. C at 5-7 (Progress notes of treating physician Robert K. Brotman from August 20, 2010 through October 26, 2010, stating that anti-androgen therapy is not appropriate for Plaintiff); (Ex. C at 21) ("The fact that Mr. Hood reports sometimes feeling like a man and sometimes like a woman rather than like a woman all the time seems to indicate that his symptoms may be more a function of a[n] unstable sense of self commonly associated with Borderline personality traits rather than an actual Gender Identity Disorder."); (Ex. A at 24)(informing Plaintiff that he had not been diagnosed with gender identity disorder and therefore, his request for hormonal therapy was inappropriate).

Defendants argue that due to the conflicting evidence in the record, Plaintiff has not "definitively shown" that he has GID (Doc. 48 at 8).  However, Plaintiff need not "definitively" show at the summary judgment stage that he suffers from GID; rather, conflicting evidence must be construed in the light most favorable to Plaintiff. See Anderson, 477 U.S. at 255 (recognizing that if there is a conflict in the evidence, "[t]he evidence of the non-

movant is to be believed, and all justifiable inferences are to be drawn in his favor."). Accordingly, at this stage of the proceedings, the Court is required to believe that Plaintiff has GID.

In order for a substantial risk of serious harm to exist from a medical condition, the condition must be "sure or very likely to cause serious illness and needless suffering" and give rise to "sufficiently imminent dangers." Baze v. Rees, 553 U.S. 35, 49-50 (2008). Defendants argue that, even if Plaintiff does suffer from GID, it is not a "serious medical condition as it relates to the plaintiff." (Doc. 48 at 8).

At present, federal courts that have addressed the issue acknowledge that GID can present a serious medical need. See Murray v. United States Bureau of Prisons, 106 F.3d 401, at *4 (6th Cir. 1997) (recognizing that "transsexuals often have a serious medical need for some sort of treatment"); Maggert v. Hanks, 131 F.3d 670, 671-72 (7th Cir. 1997) ("Gender dysphoria— the condition in which a person believes that he is imprisoned in a body of the wrong sex, that though biologically a male (the more common form of the condition) he is 'really' a female — is a serious psychiatric disorder, as we know because the people afflicted by it will go to great lengths to cure it if they can afford the cure."); White v. Farrier, 849 F.2d 322, 325 (8th Cir. 1988) (concluding that transsexualism is a serious medical need);

- 17 -

Cuoco v. Moritsugu, 222 F.3d 99, 106 (2d Cir. 2000) ("While the Second Circuit has not addressed the topic directly, we have approved of the description of transsexualism as 'a profound psychiatric disorder,' and treated it in another context as a medical condition.") (internal citations omitted); Farmer v. Hawk, 991 F. Supp. 19, 25, 26 (D.D.C. 1998) ("Because transsexualism is a serious medical condition, the Supreme Court's decision in Estelle mandates that transsexuals have a right to receive treatment."), rev'd in part on other grounds, Farmern v. Moritsugu, 163 F.3d 610 (D.D.C. 1998)(citation omitted); compare Kosilek v. Maloney, 221 F. Supp. 2d 156, 184 (D. Mass. 2002) ("A gender identity disorder is not, however, necessarily a serious medical need for which the Eighth Amendment requires treatment. As with other mental illnesses, gender identity disorders have differing degrees of severity.").

Although GID may not automatically be a serious medical condition in every individual, see Kosilek, 221 F. Supp. 2d at 184, the defendants have presented no evidence that Plaintiff's alleged GID is not a serious medical condition, other than asserting that "[i]n this case, there is no evidence that the plaintiff has attempted to mutilate himself or cause himself any other harm as a result of not having a policy or treatment for GID." (Doc. 48 at 9). Although some of the plaintiffs in the aforementioned federal cases attempted self-harm as a result of

untreated GID, existing case law does not require that a prisoner attempt self-harm before he may demonstrate a serious medical need. "[A] remedy for unsafe conditions need not await a tragic event." Helling v. McKinney, 509 U.S. 25, 33 (1993).

Viewing the facts in the light most favorable to the non-moving plaintiff, the Court finds that Plaintiff has presented sufficient facts to show his GID is a serious medical condition.

### 2. Disregard of Risk

Plaintiff asserts that the FCCC is deliberately indifferent to his serious medical condition because it has no GID policy and therefore, offers no treatment for a resident diagnosed with GID. In support of this assertion, Plaintiff submitted an April 10, 2012 letter from Defendant Montaldi which reads in part:

> Dear Mr. Hood:
>
> I am in receipt of your April 4 letter to Department of Children and Families (DCF) Secretary David Wilkins with questions you have regarding transgender treatment and services. Your response was forwarded to the Sexually Violent Predator Program for review and a response.
>
> **DCF does not have a policy for transgender treatment and services. The treatment you are referring to is not part of the Comprehensive Treatment Program.** The Department has reviewed and accepted that program.
>
> I encourage you to work with your clinical team to help you resolve any further questions you have.
>
> Sincerely,

Daniel Montaldi, Ph.D., Administrator
Sexually Violent Predator Program

(Ex. A at 26) (emphasis added).  Plaintiff also submitted a

December 22, 2011 letter from Tanguila Carlow, a social worker for

DCF (Ex. A at 24).  In that letter, Ms. Carlow noted, "I recognize

that this is a very important issue to you and that you really

would like to eventually make a total transformation from a male

to a female.  As you were recently told by the Assistant Clinical

Director, the treatment you seek is not part of the Comprehensive

Treatment Program (CTP) being offered." Id.

The limited evidence before this Court suggests that DCF and

the FCCC have a de facto policy against treating GID because it is

not part of a "Comprehensive Treatment Program."[6]  Since GID is a

recognized psychiatric disorder, a complete refusal by FCCC

officials to provide any type of treatment at all could constitute

an Eighth Amendment violation.  See Murray, 106 F. 3d at *3

(recognizing that a complete refusal by prison officials to provide

a transsexual with any treatment at all would state an Eighth

Amendment claim for deliberate indifference to medical needs.).

---

[6] This is not a case where a resident is receiving treatment
based upon the professional judgment of a physician and is merely
questioning the adequacy of such treatment. Defendants do not
assert that the FCCC would treat GID even if a resident was so
diagnosed and a treating physician recommended it.

The Seventh Circuit addressed a similar situation in
Meriwether v. Faulker, 821 F.2d 408 (7th Cir. 1987), and the
court's reasoning is instructive.  In Meriwether, the plaintiff's
medical examinations and evaluations supported a diagnosis of
"gender dysphoria."  However, Meriwether was denied all medical
treatment – chemical, psychiatric, or otherwise – for the
condition.  The Seventh Circuit noted:

> In addition to stating a serious medical need,
> the complaint contains allegations indicating
> that the defendants were deliberately
> indifferent to that need. They have failed to
> provide the plaintiff with any kind of medical
> treatment, not merely hormone therapy, for her
> gender dysphoria.
>
> . . .
>
> We therefore conclude that plaintiff has
> stated a valid claim under the Eighth
> Amendment which, if proven, would entitle her
> to some kind of medical treatment. It is
> important to emphasize, however, that she does
> not have a right to any particular type of
> treatment, such as estrogen therapy which
> appears to be the focus of her complaint. The
> only two federal courts to have considered the
> issue have refused to recognize a
> constitutional right under the Eighth
> Amendment to estrogen therapy provided that
> some other treatment option is made available.
> See Supre v. Ricketts, 792 F.2d 958 (10th Cir.
> 1986); Lamb v. Maschner, 633 F. Supp. 351 (D.
> Kan. 1986). Both of these courts nevertheless
> agreed that a transsexual inmate is
> constitutionally entitled to some type of
> medical treatment.
>
> . . .
>
> The courts in Supre and Lamb both emphasized
> that a different result would be required in
> a case where there had been a total failure to

- 21 -

> provide any kind of medical attention at all.
> That is precisely the type of case before us.
> We agree with the Tenth Circuit that given the
> wide variety of options available for the
> treatment of gender dysphoria and the highly
> controversial nature of some of those options,
> a federal court should defer to the informed
> judgment of prison officials as to the
> appropriate form of medical treatment. But no
> such informed judgment has been made here.
> While we can and will not prescribe any
> overall plan of treatment, the plaintiff has
> stated a claim under the Eighth Amendment
> entitling her to some kind of medical care.

821 F.2d 408, 413-14 (7th Cir. 1987). This Court agrees with the

Seventh Circuit that if proven, the defendants' complete failure

to provide a resident who has been diagnosed with GID any medical

treatment for that condition, with or without a policy, violates

the Eighth Amendment. See Kothmann v. Rosario, 558 F. App'x 907,

912 (11th Cir. 2014) (noting that it is "well settled in this

Circuit that intentionally refusing to provide medically necessary

treatment constitutes deliberate indifference and violates the

Eighth Amendment"). Accordingly, Defendants are not entitled to

summary judgment on Plaintiff's claim for declaratory and

injunctive relief seeking the formulation of a DCF policy for the

treatment of GID.

However, even if it is determined that Plaintiff suffers from

GID, he is not entitled to treatment of his choice. See Meriwether,

821 F.2d at 413-14. Therefore, Defendants are entitled to summary

judgment on Plaintiff's request that the Court order Defendants to

provide him with hormone therapy. Supre v. Ricketts, 792 F.2d 958, 963 (10th Cir. 1986) (declining to provide hormone therapy did not constitute deliberate indifference when prison officials offered alternate treatment); Praylor v. Texas Dep't of Criminal Justice, 430 F.3d 1208, 1209 (5th Cir. 2005).

**B.    Defendants are entitled to summary judgment on Plaintiff's claim that a delay in treatment for GID lengthened his stay at the FCCC**

Plaintiff seeks a "preliminary and permanent declaration" that he would have been eligible for release from the FCCC within one or two years after arrival had the Defendants provided him with treatment for GID (Doc. 50 at 13; Doc. 1 at 4).  Plaintiff asserts that he could have earned up to $3500.00 per day after taxes as a sign writer and "at or above minimum wage" as a ceramics worker had he been released (Doc. 50 at 13).

It is unclear the legal basis on which Plaintiff believes he is entitled to injunctive relief on this claim.  However, to the extent that he believes that the defendants' deliberate indifference to his serious medical needs caused his continued civil commitment, the claim fails.  Plaintiff's evidence does not establish claim that the FCCC's alleged failure to treat his GID caused his continued civil commitment. The following is not in dispute:

In 1992, Plaintiff was convicted of two counts of lewd and lascivious assault of a child under sixteen and one count of

- 23 -

attempted sexual battery on a child under twelve (<u>See</u> Seminole County Case No. 591992CF001232A).   After serving a ten-year sentence on those charges, Plaintiff was evaluated under Florida Statute § 394.913 by the Department of Children and Families' multidisciplinary team who concluded that Petitioner met commitment criteria as a sexually violent predator (Doc. 48-1).

The team, which consisted of Dr. Salvatore M. Blandino and Dr. David J. Partyka, concluded that Plaintiff met DSM-IV diagnostic criteria for Pedophilia, Gender Identity Disorder, Bipolar Disorder, Polysubstance Dependence in Sustained Remission in a Controlled Environment, Dissociative Disorder NOS (Rule out), and Antisocial Personality Disorder with Psychopathic, Schizotypal and Narcissistic Traits (Doc. 48-1 at 1). In 2001, Dr. Mark Highsmith of the FCCC concluded:

> The present testing suggests empathy and intimacy deficits, very poor interpersonal boundaries, poor social judgment, and a pattern of manipulating people with sexual favors for secondary gain. The present testing as well as the resident's social history indicate a disregard for rules and societal norms where his sexual activity is concerned and poor insight into the necessity of controlling his sexual impulses.

(Ex. C at 34). Dr. Highsmith diagnosed Plaintiff as needing "sex offender treatment in order to prevent the reoccurrence of committing a sex offense." <u>Id.</u>

Plaintiff attached to his complaint numerous medical records from mental health professionals who have evaluated Plaintiff during his commitment at the FCCC (Ex. B).  No treating professional concluded that untreated GID *caused* Plaintiff's continued confinement at the FCCC.  Rather, Plaintiff's continued commitment appears to be predicated upon Plaintiff's failure to follow institution rules and his non-compliance with the treatment plan designed to treat his pedophilia (Ex. B at 18; 34, 40, 47).  In fact, a letter from psychologist Shawn B. Duffee, attached to the defendants' motion for summary judgment, indicates that Plaintiff did not agree to participate in the comprehensive treatment program for men who have sexually offended until March of 2007 (Doc. 48-1 at 2).  Plaintiff has not offered any evidence to refute Dr. Duffee's statements. Nor has Plaintiff shown, or even alleged, that untreated GID *causes* pedophilia or any of the other sexual or mental health disorders with which Plaintiff has been diagnosed.

An inference that untreated GID caused Plaintiff's lengthy stay at the FCCC would not be reasonable, particularly in light of Defendants' evidence that Plaintiff refused to participate is sex offender treatment for six or seven years after his commitment. See Daniels v. Twin Oaks Nursing Home, 692 F.2d 1321, 1324 (11th Cir. 1983) ("[A]n inference is not reasonable if it is 'only a guess or a possibility,' for such an inference is not based on the

evidence, but is pure conjecture and speculation."). Accordingly, reasonable jurors would not be able to find for Plaintiff on his claim for deliberate indifference claim as it relates to his continued detention at the FCCC. Anderson, 477 U.S. at 252 (summary judgment proper when the evidence "is so one-sided that one party must prevail as a matter of law.").

Plaintiff is not entitled to a "preliminary and permanent declaration" that he would have been eligible for release from the FCCC within one or two years after arrival had the Defendants provided him with treatment for GID. See KH Outdoor, LLC, 458 F.3d at 1268 (Plaintiff not entitled to an injunction unless he has established the violation of the right asserted in his complaint).

Accordingly, it is hereby **ORDERED AND ADJUDGED AS FOLLOWS**:

1.    The motion for summary judgment (Doc. 48, filed June 27, 2014) is **DENIED** in part and **GRANTED** in part. The motion is denied on Plaintiff's claim seeking declaratory and injunctive relief for formulation of a policy to treat FCCC residents diagnosed with FCCC. The motion is granted as to all other claims.

2.    Plaintiff shall file a pretrial narrative statement within **THIRTY (30) DAYS** from the date on this Order. Thereafter, the defendants shall have **FOURTEEN (14) DAYS** to file their pretrial narrative statement. If Plaintiff fails to file a pretrial narrative statement, Defendants are not required to file or serve

a pretrial narrative statement, and Defendants shall notify the Court of Plaintiff's failure to comply.

**DONE** and **ORDERED** in Fort Myers, Florida on this ___18th___ day of February, 2015.

JOHN E. STEELE
UNITED STATES DISTRICT JUDGE


SA:  OrlP-4 11/29
Copies: Ronald C. Hood
Counsel of Record